# APRIL TERM, 1914.*

EICHKERN v. PARK BREWING CO.

NEGLIGENCE—HIGHWAYS—DRIVING IN PUBLIC WAY—INFANTS.
Where the testimony, in a negligence case, tended to show that the decedent, a minor of about 7 years of age, attempted to climb upon the side of a loaded wagon driven by a servant of the defendant, that the conveyance was going rapidly, but the driver did not see the child trying to climb on the wagon and stopped the team as soon as he saw the deceased fall, that the team was going down hill and there was no evidence that he observed the dangerous proximity of decedent, the trial court properly directed a verdict for defendant.

Error to Houghton; O'Brien, J. Submitted April 30, 1914. (Docket No. 87.) Decided June 1, 1914.

Case by John J. Eichkern, as administrator of the estate of Olavi R. Wilhonen, deceased, against the Park Brewing Company for the negligent killing of deceased. Judgment for defendant on a directed verdict. Plaintiff brings error. Affirmed.

*Burritt & Burritt,* for appellant.

*Rees, Robinson & Petermann,* for appellee.

BROOKE, J. The plaintiff in this case, as administrator of the estate of Olavi Wilhonen, seeks to recover damages from the defendant growing out of the death of plaintiff's decedent, which it is alleged was caused by the negligence of the defendant.

* Continued from Vol. 180.

Plaintiff's decedent on the day of the accident was a lad seven years of age. He with two companions, one 10 and the other 9 years of age, were playing at the side of the highway known as the Quincy road leading into the city of Hancock. At the point where the accident occurred the highway is about 20 feet wide, and going into Hancock there is a very considerable grade, about 7½ or 8 per cent. A servant of the defendant was driving his team hitched to a wagon filled with boxes down this hill, and when immediately opposite the point where the three children were playing, near an adjoining house, plaintiff's decedent ran out and attempted to climb upon the side of the wagon. He lost his footing, and the hind wheel of the wagon passed over his body.

Solomon Maki, one of the lads who was playing with plaintiff's decedent, after an examination by the court, was permitted to make his statement, although not sworn. He testified in part as follows:

"I was playing with Olavi and my little brother. Just we three playing together before he got hurt. We were playing, my brother and Olavi were playing cowboys and Indians. We were all playing inside the yard. We were playing in our yard. That is on the road where the teams go between our house and the road. I didn't live in the schoolhouse then. I lived across the street. Right across from the old schoolhouse, and we had a yard on the side of our house. It was in that yard I was playing with Olavi and my brother. We were about as far as the length of this room from the street. I saw the team coming. It was coming fast, about as fast as a horse goes on the road. About the usual way they go, the way they always go. That was the way it was coming. When I saw the team coming Olavi ran out to catch a ride and fell under the wheels and got hurt. That was while he was trying to catch on the wagon. That was the way it happened. There was one step on the side on the wagon, and he was trying to get on that step when he fell, and just as soon as he fell and got hurt then the wagon stopped. The wagon stopped as soon

as the teamster could stop the wagon, and he got off the wagon and he picked Olavi up and stood him up; then Olavi walked in front of the schoolhouse. That would be about as far as that railing. He walked that far, then he got to the steps, and when he was on the steps he fell down. * * * I told the men that Olavi tried to get a ride on the wagon. They asked me if I see the boy when he got run over. I said, Yes. Leo first spoke about his catching on to get a ride, Leo Ponka. He was trying to jump on the wagon. He didn't jump up high, and the wheel went right over. I saw it there when he tried to jump, and he jumped too low and he slipped. It was the hind wheel, the front wheel didn't touch him at all, only of the back wheels. The horses were going pretty fast. They were walking fast. At the time Olavi got hurt my brother John and Leo were there. My brother is dead."

Leo Ponka, the other boy who was present, testified in part as follows:

"I saw Olavi get hurt.

"*Q.* How did it happen, how did Olavi come to get hurt?

"*A.* With the wagon.

"*Q.* How? How did it happen?

"*A.* He jumped on the wagon to hang on the side there.

"*Q.* Where?

"*A.* On the side of the wagon.

"*Q.* And what did he do?

"*A.* He fell down, he fell down and hurt his knee right there.

"*Q.* What went over him; did anything run over him?

"*A.* Yes.

"*Q.* What?

"*A.* The horse and the wheel.

"*Q.* Which wheel was it?

"*A.* It was the back wheel.

"*Q.* The back wheel?

"*A.* Yes.

"*Q.* What was Olavi trying to do, or what was Olavi doing? What did Olavi do first?

"*A.* We were playing first.

"*Q.* Whereabouts?

"*A.* By our house.

"*Q.* How did Olavi come to go up near the wagon?

"*A.* He went hanging on the wagon.

"*Q.* Hanging on the wagon?

"*A.* Yes.

"*Q.* Whereabouts did he hang on the wagon?

"*A.* On the side there.

"*Q.* How was the wagon going, fast or slow?

"*A.* It was going pretty fast.

"*Q.* How fast? Were the horses running or walking or trotting?

"*A.* Running.

"*Q.* What did the man do? Did you see the man on the wagon?

"*A.* Yes. When Olavi was lying down on the ground he took him up then and walked by our house on the porch; then he fell down again.

"*Q.* Was he playing by the side of the road, or did he go out there?

"*A.* He was playing in the middle of the road and side of the road.

"*Q.* Did you say he tried to jump into the wagon?

"*A.* Yes.

"*Q.* How did he do that?

"*A.* He jumped on the side and then fell down, then he tried to get out, and the wheel went on his stomach.

"*Q.* Tell us again how it was, how did it happen?

"*A.* He went on the side of the wagon, then he fell down, like this, then the back wheel went right on his leg, when he tried to get out, you know. He tried to get out, and the horse went on his stomach.

"*Mr. Rees:* You mean the wheel not the horse?

"*A.* Yes."

While it is apparent from this portion of this lad's testimony that he agrees with the testimony of the witness Maki, the latter portion of his testimony indicates that he was somewhat confused, and in some places he testifies flatly that plaintiff's decedent was struck first by one of the horses. In other portions he reiterates that he ran to the side of the wagon and attempted to get on and fell under the wheel. These

two boys were the only eyewitnesses of the tragedy, There is the evidence of one witness who saw the team going down the hill, but did not see the accident, to the effect that the horses were going fast, and in her opinion too fast.  Upon the conclusion of the plaintiff's case, the judge directed a verdict for the defendant in the following language:

"It is claimed upon the part of the defendant that there is no evidence in the case from which a jury can infer any negligence on the part of the driver, and also that the child was guilty of contributory negligence, which was the sole cause of his injuries.

"In my opinion the claimed contributory negligence on the part of the child is of no importance in this case, as the only ground upon which any recovery could be had against the defendant would be upon the ground of discovered negligence, or upon the ground of wilful, wanton, and gross negligence on the part of the driver of the team, for which this defendant would be responsible.

"There is no room for any inference of gross or wanton negligence, or even of discovered negligence, unless there is some evidence in the case from which a jury could infer that the teamster either saw, or could have seen, the child in a position of danger in time to have taken measures to avert the accident.

"After a close scrutiny of the evidence, I am of the opinion that there is no evidence in the case from which a jury could, by any possibility, infer that the driver either saw or could have seen this child in a position of danger in time to have stopped his team and prevented injuring the child.  All of the evidence seems to show that the child, on a sudden impulse, ran out and in front of the horses, or ran to the side of the wagon with the intention to steal a ride.  There is no evidence from which a jury can infer that the driver saw this act of the child, or that he was in a position, or that the act happened at such a time and under such circumstances that he could and should have seen this act of the child.

"While I personally would hold a driver to the very highest degree of care in passing along a street where children are expected to be, yet even imposing that

degree of care upon the teamster in this case, I cannot see that there is any group of facts to be drawn from the evidence in this case from which the jury could say by the most attenuated inference that the driver could have, after discovering the dangerous situation of the child, done anything to avert this accident. So under all the circumstances of the case I feel that it is clearly my duty to direct a verdict for the defendant."

It is the contention of the appellant:

"That it was the duty of the driver, taking into consideration his knowledge of the situation, to drive his team with corresponding care, and in a manner reasonably safe under the circumstances, both as to speed and control. And if, under these circumstances, and such duty, the driver intentionally drove his team at what he knew was a high and dangerous rate of speed, not, indeed, intending to injure any one, nor wishing to injure any one, but in reckless disregard of consequences, and if, because thereof, the deceased was injured, then the defendant would be liable"— citing *Montgomery* v. *Railway Co.*, 103 Mich. 46 (61 N. W. 543, 29 L. R. A. 287) ; *Bedell* v. *Railway*, 131 Mich. 668 (92 N. W. 349).

There is no doubt of the correctness of the legal proposition stated by appellant's counsel, but we have no hesitation in agreeing with the conclusion of the learned circuit judge that this record is barren of testimony which shows that at the time of the accident the driver either knew, or in the exercise of ordinary prudence should have known, of the dangerous proximity of plaintiff's decedent, or of his attempt to climb upon the wagon.

The judgment is affirmed.

MCALVAY, C. J., and KUHN, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.